[Cite as *State v. Lauf*, 2017-Ohio-608.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                   CASE NO.  12-16-06

      v.

TRENTON S. LAUF,                      O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 2015 CR 84

Judgment Affirmed

Date of Decision:    February 21, 2017

APPEARANCES:

    *F. Stephen Chamberlain* **for Appellant**

    *Todd C. Schroeder* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Trenton Lauf ("Lauf"), brings this appeal from the August 11, 2016, judgment of the Putnam County Common Pleas Court sentencing Lauf after he was convicted in a jury trial of Rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, and Illegal Use of a Minor in Nudity Oriented Material in violation of R.C. 2907.323(A)(2), a felony of the second degree. On appeal, Lauf argues that there was insufficient evidence to convict him, that his convictions were against the manifest weight of the evidence, that he received ineffective assistance of counsel, and that videotaped interviews with the victim were improperly introduced into evidence.

*Facts and Procedural History*

{¶2} On November 18, 2015, Lauf was indicted for Rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree. The indictment alleged two specifications related to the Rape, namely that Lauf purposely compelled the victim to submit by force or threat of force and that Lauf caused serious physical harm to the victim. Lauf was also indicted for one count of Illegal Use of a Minor in Nudity Oriented Material in violation of R.C. 2907.323(A)(2), a felony of the second degree. Lauf pled not guilty to the charges.

{¶3} On July 13-14, 2016, Lauf's case proceeded to a jury trial. At trial, the State called six witnesses, including the alleged victim of both crimes, then rested

its case. Lauf's counsel then made a Crim.R. 29 motion for acquittal, which was denied by the trial court. Lauf presented no evidence and rested his case. At that time Lauf renewed his Crim.R. 29 motion for acquittal and the trial court partially granted the motion, dismissing the specification attached to the Rape charge alleging that Lauf caused serious physical harm to the victim.

{¶4} The case was then submitted to the jury, which found Lauf guilty of Rape in violation of R.C. 2907.02(A)(1)(b). The jury also found the specification that Lauf purposely compelled the victim to submit by force or threat of force. In addition, the jury found Lauf guilty of Illegal Use of a Minor in Nudity Oriented Material in violation of R.C. 2907.323(A)(2).

{¶5} On August 11, 2016, Lauf's sentencing hearing was held. At the hearing the prosecutor made a recommendation and then the victim and her mother spoke in favor of a harsh sentence. Lauf's counsel argued on his behalf and then Lauf made a statement, adamantly maintaining his innocence. Ultimately the trial court ordered Lauf to serve a mandatory 25 years to life prison sentence on the Rape conviction and 8 years in prison on the Illegal Use of a Minor in Nudity Oriented Material conviction. Those sentences were ordered to be served consecutively to each other. A judgment entry memorializing Lauf's sentence was filed that same day, August 11, 2016.

{**¶6**} It is from this judgment that Lauf appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THAT THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT/APPELLANT IN ALLOWING THE STATE OF OHIO TO INTRODUCE EXHIBITS THAT WERE VIDEO RECORDINGS OF THE ALLEGED VICTIM DURING AN INTERVIEW WITH CHILD PROTECTIVE SERVICES THAT CONTAINED ONLY HEARSAY WITHOUT EXCEPTION.**

**ASSIGNMENT OF ERROR 2**
**THAT THE DEFENDANT/APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE TO THE POINT THAT HE WAS NOT FUNCTIONING AS COUNSEL FOR PURPOSES OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**ASSIGNMENT OF ERROR 3**
**THAT THE DEFENDANT/APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE FOR A VALID CONVICTION.**

{**¶7**} For the sake of clarity, we elect to address the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{**¶8**} In Lauf's third assignment of error, he argues that there was insufficient evidence presented to convict him of Rape and Illegal Use of a Minor in Nudity Oriented Material and that his convictions were against the manifest weight of the

evidence. Specifically, Lauf argues that the convictions were improperly based on the uncorroborated testimony of the victim.

*Standard of Review*

**{¶9}** Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶10}** By contrast, in reviewing whether the trial court's judgment was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

*Relevant Statutes*

**{¶11}** In this case Lauf was convicted of Rape in violation of R.C. 2907.02(A)(1)(b), which reads,

> **(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:**
>
> **\* \* \***
>
> **(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.**

The jury also found Lauf guilty of an additional specification related to the Rape, namely, that he compelled the victim to submit by force or threat of force.

**{¶12}** Lauf was also convicted of Illegal Use of a Minor in Nudity Oriented Material in violation of R.C. 2907.323(A)(2), which reads,

> **(A)  No person shall do any of the following:**
>
> **\* \* \***
>
> **(2) Consent to the photographing of the person's minor child or ward, or photograph the person's minor child or ward, in a state of nudity or consent to the use of the person's minor child or ward in a state of nudity in any material or performance, or use or transfer a material or performance of that nature, unless the material or performance is sold, disseminated, displayed, possessed, controlled, brought or caused to be brought into this state, or presented for a bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian,**

> **member of the clergy, prosecutor, judge, or other person having a proper interest in the material or performance[.]**

{¶13} Lauf challenges both of his convictions on appeal. We will review the testimony presented at trial that led to Lauf's convictions below.

*Trial Testimony*

{¶14} In order to convict Lauf at trial of Rape and Illegal Use of Minor in Nudity Oriented Material, the State called six witnesses beginning with the victim, K.J., who testified that she was born in January of 2003. K.J. testified that she first met Lauf when she was 5 years old and living in South Carolina.

{¶15} K.J. testified that at some point her mother began dating Lauf so K.J. took a trip with her mother to Ohio, where Lauf lived. K.J. testified that eventually she moved with her mother to Ohio, that her mother married Lauf, and that her mother had two other children with Lauf.

{¶16} K.J. testified that Lauf imposed rules and discipline on her and that up until she was 10 years old Lauf had never been inappropriate with her. However, K.J. testified that in December of 2013 she was at her residence with Lauf and Lauf had given her a pornographic tape to watch. K.J. testified that Lauf

> **basically came up and caught me with it; and after that I was called downstairs, and I was taken to his room where him and my mom slept; and he had taken me and was talking to me about the whole video thing.**
>
> **And I don't exactly remember what he said about the video, but I know it was about how he thought I wouldn't have watched**

> **it; and he said that he was going to be like that, and he was talking about the video; and he put me on the bed and put his penis in my mouth.**

Trial Tr., p. 132-33.

{¶17} K.J. clarified that Lauf put her on the bed, and that he straddled her "shoulder area with his legs on both sides of [her] shoulders." *Id*. at 134. K.J. testified that she tried to get up but she was unable to and that Lauf ejaculated in her mouth. K.J. testified that the incident lasted "[a]t least 20 minutes." *Id*. at 135.

{¶18} K.J. testified that after the first incident Lauf gave her money and acted like it never happened. K.J. testified that she did not tell anyone immediately after the incident but she partially told her mother eventually, just not in detail. K.J. testified that she told her mother that Lauf was "close to [her] face with his penis," but she "didn't go into detail [to her mother] about how he put it in [her] mouth and all that stuff." *Id*. at 136.

{¶19} K.J. then testified to a number of additional incidents, similar to the first, where Lauf caused her to perform fellatio on him. However, K.J. testified that the "fifth and the fourth time were a little different [than the other incidents] because [Lauf] had undone [her] shirt and was messing with [her] breasts and telling [her] that he was going to hurt them and twist them." *Id*. at 139. K.J. testified that Lauf threatened her when she would not cooperate with performing fellatio on him. She testified that Lauf did twist her breasts once. *Id*.

{¶20} K.J. testified that in May of 2014 she told her mother in more detail about what Lauf was forcing her to do, but not all of the detail. K.J. testified that her mother confronted Lauf and that after that confrontation K.J., her mother, and K.J.'s siblings moved to South Carolina. However, K.J. testified that they eventually returned to Ohio and the sexual abuse continued.

{¶21} K.J. testified that there were multiple incidents that happened at her home in Fort Jennings but there were also incidents where Lauf had her perform fellatio on him at Lauf's mother's residence. K.J. testified that there was also an incident wherein Lauf forced her to perform fellatio on him while Lauf was driving his truck away from a video game store. K.J. testified that during that incident she hit her head on the steering wheel, which caused a bump on her head that her mother noticed.

{¶22} K.J. testified that on one occasion Lauf "used a throat spray [on her] that was chocolate mint flavored, and it was to numb the back of [her] throat." Trial Tr., p. 146. K.J. testified to another incident wherein Lauf watched pornography with her and that while they were watching Lauf "made [her] give him a hand job." *Id.* at 143. In addition, K.J. testified that there was an incident wherein Lauf "put his mouth on [her] vagina," but K.J. specifically testified that Lauf never inserted anything into her vagina. *Id.* at 142. K.J. testified that Lauf told her that "he was going to wait until [she] was 16." *Id.* at 143.

{¶23} K.J. testified that she was 10 or 11 years old during the majority of these incidents. K.J. testified that after some, but not all, of the incidents, Lauf gave her money.

{¶24} Regarding the Illegal Use of a Minor in Nudity Oriented Material charge, K.J. testified to an incident wherein Lauf photographed her while she had various clothing articles removed. In one photograph, which was identified by K.J. and introduced into evidence, K.J.'s shirt was pulled over her face, exposing her breasts. K.J. testified that Lauf pulled the shirt over her face so that her face was not showing. In another photograph, K.J.'s bare "backside" was photographed.

{¶25} K.J. testified that the last incident of sexual abuse occurred in approximately February of 2015. K.J. testified that her mother eventually separated from Lauf and that when Lauf was later incarcerated on a separate issue K.J. felt like it was safe to tell her mother everything. K.J. testified that she told her mother in detail everything that happened and that she was then taken to the police and interviewed by crime victim services.

{¶26} On cross-examination K.J. testified that after the first incident, but before the second, she initially just told her mother that Lauf "put his crotch area in [her] face." Trial Tr., at p. 165. K.J. testified that her mother "didn't really do anything about it." *Id*. at 166. K.J. testified that she thought her mother confronted Lauf over the phone but she was not sure.

{¶27} K.J. testified that the second time she told her mother about the incidents in May of 2014 she again did not tell her mother everything. K.J. testified that her mother did not believe her the first time and Lauf had told K.J. that no one would believe her. K.J. testified that she did not tell anyone else about the incidents despite the ability to do so. K.J. was asked whether she only told her mother everything after her mother and Lauf had divorced and she stated that she did.

{¶28} K.J. also testified on cross-examination that prior to the first incident, she had been looking at pornography. K.J. testified that no one forced her to do so and that she had been doing it since she was nine years old.

{¶29} As to the photographs, on cross-examination K.J. was asked whether the photographs of her were taken while she was trying on dance costumes with her friends and she testified that they were not and that they were taken by Lauf.

{¶30} The State next called Leslie Lauf, K.J.'s mother and Lauf's ex-wife. Leslie testified that she met Lauf in 2001 and that they had an on-again, off-again relationship while Lauf was deployed in the military overseas. Leslie testified that in June of 2009 she moved to Ohio and in 2010 she married Lauf. Leslie testified that she had two children with Lauf.

{¶31} Leslie testified that K.J. approached her at one point and told her that Lauf had put his crotch in her face but K.J. did not provide specific details. Leslie testified that they discussed it as a family "and she wanted to keep the family

together and she didn't want to split up, which that's to be expected from a child, I would say." Trial Tr., p. 190. Leslie testified that she felt like she failed to protect K.J.

**{¶32}** Leslie testified that in May of 2014 K.J. told her in more detail what was happening. Leslie testified that K.J. told her that Lauf made K.J. perform fellatio on him. *Id*. at 193. Leslie testified that she contacted Lauf about the allegations, text-messaging back and forth with Lauf on his cell phone while Lauf was at work. Leslie testified that Lauf lost his job due to being on his phone at work during that interaction.

**{¶33}** Leslie testified that after K.J. told her the second time in more detail she spoke to Brian Stechschulte about K.J.'s accusations. Stechschulte was a mutual friend of Leslie's and Lauf's.

**{¶34}** Leslie testified that after K.J.'s second revelation she moved back to South Carolina with the children. Leslie testified that while she was in South Carolina Lauf threatened her "with his military connections, putting things in [her] vehicle to have [her] pulled over and arrested for drugs. He threatened to come down and hurt [her] and [her] family." *Id*. at 193. Leslie testified that Lauf also threatened to kill himself and threatened to go to the police to have her charged with kidnapping for taking their children out of the state.

{¶35} Leslie testified that she then returned to Ohio. Leslie testified that she left K.J. at home at times with Lauf and the other children even knowing the prior accusations K.J. had made.

{¶36} Leslie testified that in April of 2015 she and Lauf divorced. Leslie testified that in July of 2015, after the divorce, K.J. told her everything and Leslie took K.J. to the police.

{¶37} Leslie also testified that she owned a throat spray that was chocolate-mint flavored called "comfortably numb" that was used to numb the back of the throat when performing oral sex. She testified that it was an adult novelty item that was in her jewelry box or in her top drawer.

{¶38} On cross-examination Leslie testified that when her daughter first came to her she did not mention sexual contact and Leslie thought Lauf was just normally playing with the children. Leslie testified that when her daughter came to her the second time, she did what she thought was best, which was to leave. Leslie testified that she did not contact any law enforcement agency at that time, though she indicated that she tried to contact people in South Carolina. Leslie testified that the people she contacted told her that they could not do anything because she was not a resident of South Carolina.

{¶39} Brian Stechschulte was the next witness to testify on behalf of the State. Stechschulte testified that he was friends with both Leslie and Lauf.

Stechschulte testified that in the summer of 2014 Leslie confided to him about an allegation that Lauf had done inappropriate things with K.J. Stechschulte testified that he had a daughter that sometimes stayed at Lauf's residence and Leslie wanted to know if anything had happened to Stechschulte's daughter. Stechschulte testified that he spoke with his daughter and nothing had happened.

{¶40} Stechschulte also testified that Lauf had left his truck at Stechschulte's residence and Stechschulte thought it was odd that there was a picture of K.J. in Lauf's truck but no pictures of Lauf's other children.

{¶41} On cross-examination Stechschulte testified that Leslie told him that K.J. had told her that sexual acts had occurred between K.J. and Lauf, but Leslie did not specify what they were. Stechschulte testified that he did not know what to believe but he did not call the police or children's services because he did not have any proof.

{¶42} Melanie Roethlisberger was the next witness to testify on behalf of the State. Melanie testified that she was an HR manager for Progressive Stamping. Melanie testified that Lauf was an employee of Progressive Stamping in May of 2014 when Lauf was terminated for using his cell phone while on a forklift.

{¶43} Scott Leland was the next witness to testify on behalf of the State. He testified that he received Lauf's cell phone and conducted a forensic investigation on it and located photographs of K.J. in various states of nudity that K.J. had

identified earlier in the trial. Leland testified that although the photographs were on Lauf's phone he could not tell whether they were taken with the phone or sent to the phone.

{¶44} Sharon Fenton was the last witness to testify on behalf of the State. Fenton testified that she worked for Allen County Children's Services and that she interviewed K.J. twice. Both of those interviews were played for the jury. In the first interview, K.J. described the sexual acts she had already testified to. The second interview dealt with the photographs Lauf had taken of her and when they were taken.

{¶45} On cross-examination Fenton testified that the first report she received in this case was in July of 2015 and that there were no reports prior to that. Fenton testified that she searched the national database for any reports that had been made and did not see any from South Carolina.

*Sufficiency of the Evidence*

{¶46} On appeal, Lauf now argues that there was insufficient evidence presented to support his convictions for Rape and Illegal Use of a Minor in Nudity Oriented Material. He argues simply that K.J. provided the primary testimony and her statements were uncorroborated and were insufficient to sustain a conviction. We disagree.

**{¶47}** At the outset, we note that while Lauf contends that there was insufficient evidence to support his convictions, his arguments really challenge the weight of the evidence, since his primary argument is that K.J.'s testimony was not credible and was uncorroborated. Nevertheless, to the extent that Lauf is making a sufficiency argument, it is well settled that " 'The testimony of a single witness, if believed by the finder of fact, is sufficient to support a criminal conviction.' " *State v. Barrie*, 10th Dist. Franklin No. 15AP-848, 2016-Ohio-5640, ¶ 21, quoting *State v. Booker,* 10th Dist. Franklin No. 15AP–42, 2015-Ohio-5118, ¶ 18, citing *State v. Elqatto,* 10th Dist. Franklin No. 11AP–914, 2012-Ohio-4303, ¶ 20.

**{¶48}** Here, K.J. specifically testified to a number of incidents wherein Lauf made her perform fellatio on him while K.J. was only 10 and 11 years old. K.J. also testified that at least one time Lauf pinned her to the bed with his knees while he made her perform the act and that other times he made threats to her. Clearly, if believed, this testimony is sufficient to support Lauf's Rape conviction and the accompanying specification that Lauf compelled K.J. to submit by force or threat of force.

**{¶49}** As to Lauf's conviction for Illegal Use of a Minor in Nudity Oriented Material, photographs of K.J. in various states of undress were located on Lauf's cell phone. K.J. specifically testified that Lauf took the photographs. K.J. even testified that Lauf pulled her shirt over her face when he took the photograph of her

breasts so that her face could not be seen. This testimony is sufficient to support Lauf's conviction for Illegal Use of a Minor in Nudity Oriented material. Thus Lauf's sufficiency arguments are not well-taken.

*Weight of the Evidence*

{¶50} Lauf next argues that his convictions were against the manifest weight of the evidence, contending that K.J. was the only witness to the alleged acts and that her testimony was not credible. We disagree.

{¶51} Regarding the Rape conviction, K.J. testified to a number of incidents that all occurred in a similar pattern, any one of which could have supported Lauf's conviction for Rape and the accompanying specification that Lauf compelled K.J. to submit by force or threat of force. Moreover, K.J. provided some details that were actually corroborated by other evidence such as her mother's possession of the chocolate-mint throat spray, which K.J. claimed Lauf used on her, and Lauf's possession of photographs of K.J. The jury elected to believe K.J.'s testimony and was in a far better position to judge her credibility related to the alleged sexual acts. Based on the testimony presented, we cannot find that Lauf's conviction for Rape was against the manifest weight of the evidence.

{¶52} Regarding Lauf's conviction for Illegal Use of a Minor in Nudity Oriented Material, Lauf's phone had photographs of K.J. in various states of nudity. K.J. provided clear testimony that Lauf took the photos. While Lauf's counsel

implied through cross-examination that the photographs were taken by K.J. or her friends as they tried on dance costumes, the jury elected to believe K.J.'s story and was in a far better position to judge her credibility. Based on the evidence presented, we cannot find that Lauf's conviction for Illegal Use of a Minor in Nudity Oriented Material was against the manifest weight of the evidence or that the factfinder clearly lost its way. Accordingly, Lauf's third assignment of error is overruled.

### *First Assignment of Error*

**{¶53}** In Lauf's first assignment of error he argues that it was error to permit the State to play the video recordings of the two interviews that the Allen County Children's Services worker Sharon Fenton conducted with the victim, K.J. Specifically, Lauf argues that the recordings were not admissible as prior consistent statements pursuant to Evid.R. 801(D)(1)(b), that they were inadmissible hearsay, and that they were prejudicial.

### *Standard of Review*

**{¶54}** We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *State v. Cassel*, 2d Dist. Montgomery No. 26708, 2016-Ohio-3479, ¶ 13, citing *State v. Graham,* 58 Ohio St.2d 350 (1979) and *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 19. An abuse of discretion constitutes a decision that is arbitrary, capricious, or grossly unsound. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶55}** However, where Lauf did not object to an evidentiary issue, we review his arguments on appeal for plain error. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 69, *reconsideration denied*, 139 Ohio St.3d 1487, 2014-Ohio-3195, and *cert. denied*, 135 S.Ct. 959 (2015). We take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail, Lauf must show that an error occurred, that the error was plain, and that but for the error, the outcome of the trial clearly would have been otherwise. *Mammone* at ¶ 69, citing *State v. Barnes,* 94 Ohio St.3d 21, 27 (2002).

*Introduction of Videotaped Interviews at Trial*

**{¶56}** In this case Sharon Fenton of Allen County Children's Services conducted two interviews with K.J. The first interview concerned the sexual acts that Lauf committed against K.J. and the second interview concerned the photographs that Lauf took of K.J. Fenton was the last witness to testify on behalf of the State, and during her testimony, the State indicated that it intended to play Fenton's interviews with K.J. to the jury.

**{¶57}** Prior to playing the first video for the jury, the court had a discussion with the parties regarding the use of the interviews.

> **THE COURT: It's my understanding that the prosecution is prepared to present a video with audio of interviews of the alleged victim that have content of approximately an hour and 15 minutes; is that correct?**

**[PROSECUTOR]: That's my feeling as I stand here.**

**THE COURT: All right. And as to the actual showing of these videos, you have heard and seen these, [Defense Counsel], correct?**

**[DEFENSE COUNSEL]: Yes, I have.**

**THE COURT: And are you objecting? And, if so, we need to talk about that now.**

**[DEFENSE COUNSEL]: You mean because there's no transcript?**

**THE COURT: No, no.**

**[DEFENSE COUNSEL]: No, I'm not objecting to its use. I've seen it, so…**

**THE COURT: Okay. But you are in agreement that these are statements made that would, that are admissible?**

**[DEFENSE COUNSEL]: By the victim?**

**THE COURT: Yes.**

**[DEFENSE COUNSEL]: Yes.**

Trial Tr., p. 253-254.

{¶58} Following this discussion, the first interview of K.J. was played for the jury, which primarily concerned the alleged sexual acts. A recess was taken after the first interview was played in its entirety. Before court reconvened so that the second interview could be played, the following discussion was held between court and counsel.

**THE COURT:  It's my understanding that you're prepared to show us a video that's approximately 30 minutes, [Prosecutor], which would involve the same two individuals, being the alleged victim and the interviewer who is presently on the stand concerning photographs that are depicted in State's 1, 2, and 3; is that correct?**

**[PROSECUTOR]:  It is, Your Honor.**

**THE COURT:  [Defense Counsel]?**

**[DEFENSE COUNSEL]:  Well, my objection is, it's duplicative because the victim has already testified about those pictures, they've been identified as coming from [Lauf's] phone; and this serves no purpose other than besides that testimony.  This is worthless in terms of new evidence for the jury.**

**THE COURT:  [Prosecutor]?**

**[PROSECUTOR]:  I don't see any distinguishing factor between the first video which was not objected to and this video.  It is a continuation of the interview to depict or talk about the pictures and where they were taken.  It's admissible as non hearsay under 801(D)(1)(b).**

**In addition, the Third District has ruled that cases of sex offenses involving minors, the showing of the original forensic interview is helpful to the jury and encourages it as a result.  That case decided is 2011-Ohio-3126[1] and had this issue before the court before and cited the same case under similar circumstances, and it was ruled admissible and shown to the jury.**

**THE COURT:  [Defense Counsel], the rule he's citing is 801(D)(1)(b) which refers to consistent statements with a declarant's testimony, and we have had this issue before.  But it is under (D)(1)(b), correct, [Prosecutor]?**

---

[1] The case cited by the State here is *State v. Gutierrez*, 3d Dist. Hancock No. 5-10-14, 2011-Ohio-3126.  Its relevance will be discussed *infra*.

**[PROSECUTOR]: That's correct.**

**And it's my understanding the defense in this case is not one relating to place or time but a straight-out denial that the defendant was responsible for the pictures in the first place and a shifting of responsibility on someone else.**

**THE COURT: Is that correct, [Defense Counsel]? It's my understanding that that is the defense position that the defendant did not take these pictures.**

**[DEFENSE COUNSEL]: * * * I don't believe that would apply in this case, Judge, because this DVD is being offered for purposes of finding that her testimony is consistent but it's not being used to rebut an express or imply [sic] charge against declarant, a recent fabrication or improper inference or motive. All it does, essentially, is –**

**THE COURT: Well, it is the defense position, is it not, that the defendant did not take these photographs and that the, what would be the declarant in this case is fabricated.**

**[DEFENSE COUNSEL]: But that's part of our general denial of the charges, and –**

**THE COURT: But that's correct that that's your position, isn't it?**

**[DEFENSE COUNSEL]: Yeah.**

**THE COURT: That the alleged victim is fabricating when she stated that the pictures were taken by the defendant?**

**[DEFENSE COUNSEL]: Okay.**

**THE COURT: I'm going to overrule the objection.**

Tr. at pp. 333-336. Following this discussion, court reconvened and the second

interview with K.J. regarding the photographs was played for the jury.

-22-

*The Parties' Arguments*

**{¶59}** On appeal, Lauf now argues that *both* interviews should not have been played for the jury. He argues that they both constituted inadmissible hearsay and that both were inadmissible as prior consistent statements under Evid.R. 801(D)(1)(b), contrary to the prosecutor's claim.

**{¶60}** Evid.R. 801(D)(1)(b) provides that an out-of-court statement is not hearsay if "[t]he declarant testifies at trial or hearing, and is subject to cross-examination concerning the statement, and the statement is * * * consistent with the declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive * * *."

**{¶61}** Notably, however, prior consistent statements are not admissible under this hearsay exemption "to counter all forms of impeachment or to bolster [a] witness merely because she has been discredited." *Tome v. United States,* 513 U.S. 150, 157, 115 S.Ct. 696 (1995). As a result, the question is "not whether [the out-of-court statements] suggested that the declarant's in-court testimony was true," but is instead "whether the out-of-court statements rebutted the alleged motive to falsify testimony or the improper influence * * *." *State v. Bleigh,* 5th Dist. No. 09–CAA–03–0031, 2010–Ohio–1182, ¶ 82, citing *Tome* at 157-158. "Thus, for an out-of-court statement to rebut an alleged motive to falsify testimony, the out-of-court statement must have been made before the alleged motive arose." *State v. Bump*,

3d Dist. Logan No. 8-12-04, 2013-Ohio-1006, ¶ 75, citing *State v. Richcreek,* 196 Ohio App.3d 505, 2011–Ohio–4686, ¶ 56 (6th Dist.) ("[Evid.R.801(D)(1)(b)] contains a timing component for prior statements in relation to a charge of 'improper motive.' That is, only prior consistent statements made *before* the alleged motive to fabricate arose are admissible. The issue is not when the charge was made, but when the improper motive arose.").

{¶62} In arguing that the video recordings were inadmissible under Evid.R. 801(D)(1)(b) in this case, Lauf contends that while the videos of K.J.'s interviews were consistent with K.J.'s testimony, the recordings did not rebut an express or implied charge of *recent* fabrication or improper influence or motive. Lauf further contends that in order to plead not guilty he had to take the "implied position that [K.J.] was not truthful in her allegations." Appt.'s Br. at 14. Lauf argues that a mere denial of the charges does not amount to a challenge asserting fabrication or improper influence or motive.

{¶63} By contrast, the State argues that defense counsel repeatedly asserted that K.J. was lying about the allegations both in opening statements and through cross-examination of various witnesses, opening the door to the introduction of this evidence. The State contends that defense counsel indicated that K.J.'s allegations were fabricated after Lauf and Leslie were divorced, and that defense counsel implied that the divorce provided an improper motivation for K.J. to lie.

{¶64} To support its argument, the State points to the following segments of defense counsel's opening statement.

> **Now, the mother didn't report [this] because of her socioeconomic status or whatever reason she's going to give you from that witness stand, but I will tell you now I want you to consider what you would do and is it reasonable to wait 15 months before it's reported to the police?**
>
> **So the question is then if she waits that long, is it possible that she doesn't believe what her daughter is saying and is it possible that the daughter is an inveterate liar? Or is it possible that none of these events occurred and didn't really come to a head until after they were divorced?**

Trial Tr., at 120-21.

> **I want you to think very carefully about the fact that there is no corroborating evidence. I can't stress that enough. I mean, we all watch enough of the CSI shows and think that there might be something; but, believe me, there isn't. There is nothing. There's no junk science, there's no science at all that says she was the victim of any kind of sexual abuse other than her statement, which may or may not be believed, keeping in mind that we don't have to prove anything.**

*Id*. at 122-123.

> **[Lauf] did not take the pictures, I don't care what [K.J.] says. She's going to say he was there and took the pictures; but there were so many people in the house that day, that would have been next to impossible.**

*Id*. at 123-124.

{¶65} In addition to these excerpted comments made by defense counsel in opening statements, the State asserts that there were multiple times during the

examination of witnesses where defense counsel challenged whether K.J.'s story was fabricated or based on an improper motivation. For example, defense counsel strongly implied that K.J. fabricated her story after her mother and Lauf separated. During cross-examination, K.J. was asked,

**Q: After your mom was divorced from Trent, right?**

**A: Yes.**

**Q: And that's when all this first was revealed, right?**

**A: Yes.**

**Q: Other than the 2014 phone call that got Trent fired, nothing else was done until 2015, March or April, which was after they were already divorced?**

**A: Yes.**

Trial Tr. at p. 176. Defense counsel also asked K.J. who she told her story to, and why she did not tell anyone other than her mother.

{¶66} Defense counsel further challenged K.J.'s veracity related to the photographs on cross-examination. K.J. was asked whether the photographs were taken before her mother and Lauf were divorced, and K.J. said yes. Additionally, K.J. was asked whether she ever had Lauf's phone, and she said she had in the past. Defense counsel then implied that the photographs were taken while girls were trying on dancing costumes, rather than by Lauf, as K.J. testified.

{¶67} The State contends that defense counsel thus challenged whether K.J. had recently fabricated her story and that defense counsel was challenging whether K.J. had an improper motive via the divorce, making the video interviews of her admissible as prior consistent statements.

{¶68} In the alternative, the State argues that because the victim was a child, the videotaped interviews aided the jury in making determinations about K.J.'s credibility. The State cites *State v. Gutierrez*, 3d Dist. Hancock No. 5-10-14, 2011-Ohio-3126, in support of its argument, wherein this Court determined that it was not reversible error to play a forensic interview of a child-victim where the victim testified at trial. This Court reasoned in *Guiterrez* that playing a child-victim's forensic interview was not reversible error where defense counsel strongly challenged the victim's credibility throughout the entire trial process, which took place nearly two years after the last episode of abuse, and where the jury was able to see the child's demeanor during the interview and judge the victim's credibility. The State argues in this case that because the victim was a child, playing the videos assisted the jury in making its credibility determination.

*Analysis*

{¶69} Regarding the first interview with K.J. that was played for the jury, the transcript demonstrates that Lauf's trial counsel did not object to showing the

interview to the jury. Thus we review the first interview under a plain error standard.

{¶70} At the outset, we note that it is possible that Lauf did not object to the playing of the first interview because there were some inconsistencies between K.J.'s testimony at trial and her first interview. For example, in her interview K.J. indicated that the first time Lauf had her perform oral sex on him it lasted "maybe" 10 minutes, whereas at trial K.J. testified it was at least 20 minutes. In her interview K.J. also indicated that she had been watching pornography she found herself when Lauf "caught" her, whereas at trial she testified that Lauf had provided the pornography to her. In her interview K.J. seemed to indicate that the throat spray was used on her multiple times whereas at trial she testified it was used on her once. Thus trial counsel may have wanted the first interview with K.J. to be played so that the jury would focus on these inconsistencies.

{¶71} In the event that defense counsel actually did desire the first interview to be played, we would be dealing with invited-error rather than the already stringent plain error standard. Under the invited-error doctrine, " '[a] party will not be permitted to take advantage of an error which he himself invited or induced.' " *State v. Bey*, 85 Ohio St.3d 487, 492-93, 1999-Ohio-283, quoting *Hal Artz Lincoln– Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus; *State v. Seiber*, 56 Ohio St.3d 4, 17 (1990). As this error could arguably

be considered invited, we could overrule this portion of Lauf's assignment for this reason alone.

**{¶72}** Nevertheless, even if defense counsel did not want the first interview to be played, and erroneously stated to the trial court that the first interview was admissible, we still cannot find that playing the first interview was plain error here. Defense counsel did challenge whether K.J. had fabricated her story and did imply that the divorce played a role in motivating K.J.'s allegation. However, even assuming the appropriate timing requirements of Evid.R. 801(D)(1)(b) had not been met in this case for the interview to constitute a prior consistent statement, the statements made in the first interview were merely cumulative to what K.J. had already testified regarding the Rape allegation, thus we could not find in these circumstances that but-for the introduction of the first interview Lauf would not have been convicted of Rape. Thus Lauf's arguments related to the first interview are not well-taken.

**{¶73}** Unlike the first interview, Lauf did object to the prosecution playing the second interview, which concerned the photographs Lauf had purportedly taken of K.J. However, even under a harmless-error review, rather than a plain error or invited error review, we cannot find that playing the interview was anything but harmless here.

{¶74} The second interview of K.J. was consistent with her testimony at trial about the photographs and it added nothing material that would warrant reversal of Lauf's conviction for Illegal Use of a Minor in Nudity Oriented Material. Any evidence contained therein was cumulative, and did not impact Lauf's substantial rights, even if we assumed its admission was erroneous. In coming to this conclusion, we note that the defense is correct in that a mere denial of charges is not sufficient to support the introduction of forensic interviews with a child simply to bolster the child's testimony. Such a stance would allow *all* forensic interviews to be played as prior consistent statements. Moreover, there is a timing component related to the requirement of "recent fabrication," and it is not clearly established in this case as to whether the timing element was met here. As we have stated, however, even assuming the timing element was not met, we cannot find that prejudicial error resulted in this case. Therefore, Lauf's first assignment of error is overruled.

### Second Assignment of Error

{¶75} In Lauf's second assignment of error, he argues that he received ineffective assistance of counsel for his attorney's failure to object to the playing of the interviews with the victim. In addition, Lauf argues that defense counsel failed to object to the prosecutor questioning Leslie about whether she was aware that she could be charged with a crime for failing to report her daughter's abuse.

**{¶76}** To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him. *State v. Phillips*, 3d Dist. Allen No. 1-15-43, 2016-Ohio-3105, ¶ 11, citing *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley,* 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

**{¶77}** In this instance we have already determined by our resolution of the first assignment of error that counsel's actions related to the first interview may have been trial strategy, but even if they were not, playing the first interview did not ultimately prejudice Lauf. Similarly, defense counsel *did* actually object to playing the second interview and the ultimate playing of the video did not prejudice Lauf, as previously determined, thus any related arguments claiming ineffective assistance of counsel based on these issues are not well-taken.

**{¶78}** As to Lauf's final argument that trial counsel should have objected to the prosecutor questioning Leslie about whether she was aware she could be charged

with a crime, Lauf does not demonstrate how this was error, let alone how it was prejudicial.

{¶79} Moreover, Lauf's trial strategy seemed to be to show that K.J.'s mother did not actually believe K.J. and that such allegations were only presented once Leslie and Lauf were getting divorced. Thus counsel may not have objected out of trial strategy. However, even if there was somehow error with counsel's failure to object, we cannot find it was prejudicial in this case based on the substantial evidence presented. Therefore, Lauf's arguments are not well-taken and his second assignment of error is overruled.

{¶80} For the foregoing reasons Lauf's first, second, and third assignments of error are overruled and the judgment of the Putnam County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**